UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>vs.<br><br><br>ROBERT LYNN WOLFE, JR.,<br>Defendant. | 1:25-CR-10004<br><br>REPORT AND RECOMMENDATION<br>ON MOTION TO SUPPRESS |

In this drug and firearm case, Robert Lynn Wolfe, Jr. ("Wolfe") moves to suppress physical evidence seized from his house and safes, as well as statements he made during and after the search.[1] He claims that: (1) the warrant authorizing the home search lacked probable cause; (2) he was subject to custodial interrogation without any *Miranda* warnings; and (3) his warned statements and consent to a urine sample later on were tainted and involuntary.[2] Because officers lawfully obtained evidence from Wolfe's residence and statements from him after—but not before—his *Miranda*

---

[1] Dkt. No. 24.
[2] Dkt. Nos. 24, 25, 32.

1

advisement, the suppression motion should be granted in part and denied in part, as explained more fully below.

## BACKGROUND

On April 19, 2024, Roberts County Deputy Sheriff Dylan Pfeilsticker requested a search warrant for Wolfe's residence to look for drugs.[3] The request was based on tips from two distinct informants.[4] A state court judge found probable cause and issued the warrant.[5] While executing it, officers handcuffed Wolfe and put him in the backseat of a patrol car.[6] He was not informed of his *Miranda* rights.[7] In the house, officers found multiple locked safes.[8]

Believing that they would need another search warrant to break open the safes, Deputy Pfeilsticker went out to the patrol car and asked Wolfe what the code was for the safe located in the bedroom.[9] Wolfe responded "1-2-3-4-5" and requested his inhaler.[10] Pfeilsticker tried that code on the bedroom safe, but it did not work.[11] So he went back to Wolfe and demanded the safe's code.[12] Wolfe told him to try "1-2-3-4-5-6" and requested his inhaler again.[13]

---

[3] Dkt. Nos. 25-1, 25-2.
[4] Dkt. No. 25-1.
[5] Dkt. No. 25-2.
[6] Dkt. No. 39, at 17:16–22.
[7] Suppress. Hr'g. Ex. 3.
[8] Dkt. No. 39, at 20:16–21.
[9] Suppress. Hr'g Ex. 3, at 08:30, 08:40, 10:37, 11:11.
[10] *Id*. at 11:16–12:21.
[11] Dkt. No. 39, at 42:3–5.
[12] Suppress. Hr'g Ex. 3, at 21:56.
[13] *Id*. at 22:07, 22:10.

Officers then discovered gun safes in the basement, one of which opened with the "1-2-3-4-5" code.[14] Inside the safe was a Remington rifle.[15] Deputy Pfeilsticker went out to the car a third time and asked Wolfe about the bedroom safe code.[16] This time, Pfeilsticker brought the inhaler and let Wolfe use it.[17] Wolfe offered to provide the code to the safe if Pfeilsticker let him take a hit of his vape pen.[18] When Pfeilsticker agreed to do so, Wolfe gave him the code.[19] The safe contained approximately 13 grams of cocaine and 10 grams of marijuana.[20]

After the search and discovery of the contraband, another deputy transported Wolfe to the Roberts County jail.[21] There, Deputy Pfeilsticker questioned Wolfe without *Mirandizing* him.[22] Pfeilsticker's inquiry focused on who and where Wolfe got his cocaine and marijuana from.[23] Wolfe would not disclose his source, because he was afraid for his own life and that of his kids, and insisted that he was just a user, not a dealer.[24] "I'm a coke addict," Wolfe admitted, who had used "every day" for the "last *** six months."[25]

---

[14] Dkt. No. 39, at 22:21–25.
[15] *Id*. at 22:13–25.
[16] Suppress. Hr'g Ex. 3, at 22:41–43, 39:27–54.
[17] Dkt. No. 39, at 23:4–7; 43:25–44:4.
[18] Suppress. Hr'g Ex. 3, at 40:47– 42:35; Dkt. No. 39, at 24:13–15, 24:25–25:4, 44:8–9.
[19] *Id*.
[20] Dkt. No. 39, at 25:5–17.
[21] *Id*. at 52:11–12.
[22] Suppress. Hr'g Ex. A, at 00:29–03:37.
[23] *Id*. at 00:29, 01:54, 02:09.
[24] *Id*. at 00:49–01:03, 01:26–01:52.
[25] *Id*. at 00:56–01:06, 03:35–44.

Afterward, Deputy Pfeilsticker read Wolfe his *Miranda* rights and then followed up on Wolfe's earlier admission: "So you said you've been using every day for like six months[?]"[26] The two continued to discuss Wolfe's drug use, prompting Pfeilsticker to ask Wolfe if he would provide a urine sample.[27] Wolfe agreed saying, "What the hell, I already confessed to being a drug addict, I might as well."[28] The sample tested presumptively positive for THC and cocaine.[29]

## DISCUSSION

### A. Search Warrant

Wolfe first claims that the April 19 search warrant for his residence was erroneously issued, and all evidence seized under its authority should be suppressed.[30] He contends that the information in the warrant affidavit was not only unreliable but also stale.[31] The Court, however, need not delve into these contentions because the "good-faith" exception to the warrant requirement preempts them.

In *United States v. Leon*,[32] the Supreme Court created an exception to the exclusionary rule.[33] Under this exception, the rule is not to "be applied to exclude the use of evidence obtained by [ ] officers acting in reasonable reliance on a detached and

---

[26] *Id*. at 04:01–44, 06:16–21.
[27] *Id*. at 06:16–07:35, 08:27–09:05.
[28] *Id*. at 08:52–09:05.
[29] Dkt. No. 39 at 49:3–6.
[30] Dkt. Nos. 24, 25.
[31] Dkt. No. 25, at 6–11.
[32] 468 U.S. 897 (1984).
[33] *Id*. at 922.

4

neutral [ ] judge's determination of probable cause and the issuance of a search warrant that is ultimately found to be invalid."[34]

The *Leon* exception permits the fruits of a warrant-based search to be used as evidence when an officer's reliance on the warrant is objectively reasonable.[35] Suppression though remains an appropriate remedy if the judge issuing the warrant is misled by information in an affidavit that the affiant knows is false or is made with reckless disregard for the truth.[36] Evidence should also be excluded when the issuing judge abandons his judicial role because in such circumstances, no reasonably well-trained officer would rely on the warrant.[37] And an officer cannot manifest objective good faith if the warrant is based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."[38] Finally, depending on the circumstances of the case, a warrant may be so facially deficient—because, for example, it failed to particularize the place to be searched or the things to be seized—that an executing officer cannot reasonably presume it to be valid.[39]

---

[34] *United States v. Taylor,* 119 F.3d 625, 629 (8th Cir. 1997) (*citing Leon*); *see also United States v. Gipp,* 147 F.3d 680, 688 (8th Cir. 1998) (applying the *Leon* good-faith exception to a search warrant).
[35] *See Leon,* 468 U.S. at 922–23; *see also Massachusetts v. Sheppard,* 468 U.S. 981, 988 (1984); *United States v. Moya,* 690 F.3d 944, 948 (8th Cir. 2012).
[36] *See Leon,* 468 U.S. at 923 (citing *Franks v. Delaware,* 438 U.S. 154 (1978)).
[37] *Id.* (citing *Lo–Ji Sales, Inc. v. New York,* 442 U.S. 319 (1979)).
[38] *Id.* (quoting *Brown v. Illinois,* 422 U.S. 590, 610–11 (1975) (Powell J., concurring in part)).
[39] *See id.; see also Sheppard,* 468 U.S. at 988–91.

Nothing in Deputy Pfeilsticker's affidavit appears to contain knowing, intentional, or reckless falsehoods. Any assertions to the contrary are unsupported by the record.

There is also no evidence that the issuing judge failed to act in a neutral and detached manner or that he was a mere "rubber stamp." Nor is there evidence to suggest that the judge blindly approved the search warrant.

Wolfe's challenge notwithstanding, the Court cannot conclude that the state judge issued a search warrant completely lacking in probable cause. And officers' reliance on the warrant was in good faith and objectively reasonable. They believed that they had a valid warrant and court approved authority to search for, and seize, evidence from Wolfe's house. Wolfe received the benefit of a judge's impartial evaluation before his property was searched.

The drugs, paraphernalia, and gun confiscated from the home and safes are admissible at trial.[40]

### B. Statements

Wolfe seeks to exclude the statements he made while in the patrol car and those he gave at the jail, before and after being *Mirandized*.[41] He maintains that his statements were evoked in violation of *Miranda* and were involuntary.[42]

---

[40] *Leon*, 468 U.S. at 926; *United States v. Johnson*, 709 F.2d 515, 516 (8th Cir. 1983).
[41] Dkt. Nos. 25, at 11–14; 32, at 4–8.
[42] *Id*.

"Generally, statements made by a person in the context of a custodial interrogation must be suppressed if that person is not first advised of his rights pursuant *Miranda*."[43] One is in custody for purposes of *Miranda* when there is a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."[44] Interrogation is any question, word, or action that an officer should know is "reasonably likely to elicit an incriminating response."[45] *Miranda* rights may, however, be waived if done so "voluntarily."[46] A statement or waiver is involuntary if it is "extracted by threats, violence, or express or implied promises sufficient to overbear the [suspect's] will and critically impair his capacity for self-determination."[47]

1. **Statements in the Patrol Car**

Wolfe was in custody while in the patrol car. He was handcuffed, locked in the back seat, and not free to leave.[48] And he was interrogated. Deputy Pfeilsticker asked Wolfe for the code to the bedroom safe three times,[49] questions reasonably likely to elicit

---

[43] *United States v. Magallon*, 984 F.3d 1263, 1282 (8th Cir. 2021) (citing *Miranda v. Arizona*, 384 U.S. 436, 444, (1966).
[44] *United States v. Yielding*, 657 F.3d 688, 705 (8th Cir. 2011) (citing *California v. Beheler*, 463 U.S. 1121, 1125, (1983)).
[45] *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).
[46] *Magallon*, 984 F.3d at 1282 (citing *Miranda*, 384 U.S. at 444).
[47] *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004) (en banc); *see also United States v. Whipple*, No. 3:23-CR-30024, 2023 WL 8600544, at *8 (D.S.D. Dec. 12, 2023) ("The same analysis for whether a defendant's waiver of his *Miranda* rights was voluntary applies to determine the voluntariness of a defendant's statement under the Fifth Amendment.")
[48] Dkt. No. 39, at 17:16–22.
[49] *Id*. at 21:6–22, 23:9–11.

7

incriminating responses about his involvement with drugs.[50] Wolfe's statements are therefore inadmissible as substantive evidence.

But can the statements be used to impeach any inconsistent testimony Wolfe himself may offer? That depends on whether the statements were voluntary.[51] When determining the voluntariness of a statement, "the issue is 'whether or not the authorities overbore the [suspect's] will and critically impaired his capacity for self-determination.'"[52]

Here, Wolfe had the mental fortitude to bargain for his vape pen in exchange for the bedroom safe code.[53] He had been given his inhaler.[54] His statements were ones he wanted to make and were not the product of an environment and questioning that was so menacing it overpowered his will and stymied his decision-making.[55] So while not admissible in the government's case-in-chief, Wolfe's statements to Deputy Pfeilsticker in the patrol car may be used to impeach Wolfe if he takes the stand and gives contradicting testimony.[56]

---

[50] *Innis*, 446 U.S. at 301; *see also United States v. Widi*, 686 F. Supp. 2d 107, 113 (D. Me. 2010), (determining that questioning a handcuffed suspect about the combination to a safe while executing a search warrant amounted to custodial interrogation because it was likely to elicit incriminating information).
[51] *United States v. Garreau*, 735 F. Supp. 2d 1155, 1167 (D.S.D. 2010), *aff'd*, 658 F.3d 854 (8th Cir. 2011).
[52] *United States v. LaRoche*, 83 F.4th 682, 689 (8th Cir. 2023), (quoting *LeBrun*, 363 F.3d at 725), *cert. denied*, 144 S. Ct. 858, 218 L. Ed. 2d 51 (2024).
[53] Suppress. Hr'g Ex. 3, at 39:54–40:51, 41:33–35, 42:35–54; Dkt. No. 39, at 24:13–15, 24:25–25:6, 44:8–10.
[54] Dkt. No. 39, at 43:25–44:4.
[55] *Oregon v. Hass*, 420 U.S. 714, 722–23, (1975) (holding that defendant's statements were voluntary and could be used as impeachment because the "pressure on him was no greater than that on any person in like custody or under inquiry by any investigating officer").
[56] *Harris v. New York*, 401 U.S. 222, 225 (1971).

### 2. Statements at the Jail

#### a. Pre-*Miranda*

While at the jail, Deputy Pfeilsticker interrogated Wolfe again without *Miranda* warnings.[57] Wolfe had been arrested and charged at that time and was in custody.[58] A few minutes into the conversation, Pfeilsticker stopped Wolfe and advised him of his rights under *Miranda*.[59] The government concedes that Wolfe's pre-*Miranda* statements cannot be used at trial before it rests.[60] But the statements may be offered as potential impeachment evidence, the government asserts, should Wolfe testify.[61] The Court agrees.

Wolfe's unwarned statements were voluntary. He would not give up his source and maintained that he was not a drug dealer, only a user.[62] And he acknowledged that he was an addict who ingested drugs daily.[63] When Wolfe spoke, he did so after contemplation and with an eye toward protecting himself and his children.[64] Deputy Pfeilsticker's tactics—while contrary to *Miranda*—were not coercive and did not undermine Wolfe's choice-making faculties, or his self-will.

---

[57] Suppress. Hr'g Ex. A, at 00:29–03:40.
[58] *Id*. at 00:01–00:29; Dkt. No. 39, at 46:1–21, 52:16–18.
[59] *Id*. at 04:01–04:33.
[60] Dkt. Nos. 39, at 67:1–11; 43, at 2, 4.
[61] Dkt. No. 43, at 2, 4.
[62] Suppress. Hr'g Ex. A, at 00:56.
[63] *Id*. at 03:37–38.
[64] *Id*. at 01:51–52.

### b. Post-*Miranda*

Wolfe's post-*Miranda* statements require more discussion and turn on whether *Seibert*[65] or *Elstad*[66] controls.

When a defendant makes incriminating statements without first being warned of his *Miranda* rights, courts in the Eighth Circuit use the test from Justice Kennedy's concurrence in *Seibert*[67] to determine whether statements he made in a later, properly warned, interrogation should be suppressed.[68] In *Seibert*, police arrested a suspect, intentionally refrained from giving her *Miranda* warnings, and interrogated her in the middle of the night.[69] The suspect confessed, after which she received a short break before being interrogated again – this time with *Miranda* warnings at the start – and gave the same confession.[70] While questioning the suspect the second time, the interrogating officer confronted her with unwarned statements she had given previously.[71]

This same officer admitted that he made a "conscious decision" to withhold the suspect's *Miranda* warnings.[72] The officer testified that he used a technique where he

---

[65] *Missouri v. Seibert*, 542 U.S. 600 (2004).
[66] *Oregon v. Elstad,* 470 U.S. 298 (1985).
[67] *See* 542 U.S. at 619-22.
[68] *See e.g., Magallon*, 984 F.3d at 1283; *United States v. Torres-Lona*, 491 F.3d 750, 757-58 (8th Cir. 2007); *United States v. Briones*, 390 F.3d 610, 613-14 (8th Cir. 2004).
[69] *See Seibert*, 542 U.S. at 604-05.
[70] *See id*. at 605.
[71] *See id*.
[72] *Id*. at 605-06.

would "question first, and then give the [*Miranda*] warnings, and then repeat the question 'until I get the answer that she's already provided once.' "[73] The state trial court only suppressed the suspect's unwarned statements, and the case eventually wound up before the Supreme Court.

Although there was no majority opinion, Justice Kennedy's concurrence provided the final vote for suppression of the later-warned statements.[74] The plurality adopted a multi-factor test to determine whether mid-questioning warnings were effective.[75] Justice Kennedy though believed the case should be resolved on narrower grounds, suppressing post-warning statements "only where the police intentionally used [a] two-step interrogation technique to render *Miranda* warnings ineffective."[76]

The Eighth Circuit has determined that when there is no evidence of "deliberately coercive or improper tactics" (such as the technique at issue in *Seibert*) *Oregon v. Elstad*[77] controls.[78] The Supreme Court in *Elstad* held: "A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but

---

[73] *Id*. at 606.
[74] *See id.* at 618.
[75] *See id.* at 615.
[76] *United States v. Ollie*, 442 F.3d 1135, 1142 (8th Cir. 2006).
[77] 470 U.S. 298 (1985).
[78] *United States v. Walker*, 518 F.3d 983, 985 (8th Cir. 2008); *see also United States v. Robinson*, 140 F.4th 989, 995 (8th Cir.) (when "officers have made no [ ] calculated effort to elicit a confession, *Seibert* is not implicated, and the admissibility of post warning statements is governed by the principles of [ ] *Elstad* [ ]"), *petition for cert. filed*, (U.S. Sept. 23, 2025) (No. 25-5707).

11

unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement."[79]

Unlike the defendant in *Seibert*, Wolfe did not undergo an interrogation technique designed to sidestep *Miranda* or thwart its purpose.[80] Wolfe has not pointed to any evidence of improper coercion in the *Mirandized* interview. He answered Deputy Pfeilsticker's questions, implicating himself in many ways, but denied being a drug dealer or fentanyl user.[81] Nor is there any evidence that Pfeilsticker used compulsion to extract Wolfe's statements during their brief, narrow-in-scope, pre-warning conversation or that Wolfe did not knowingly and voluntarily waive his *Miranda* rights and agree to speak with Pfeilsticker.[82]

Granted, Deputy Pfeilsticker did try again to elicit information about Wolfe's drug source and use of cocaine. But Wolfe would not reveal his source, saying only that the cocaine came from "this guy" and "his partner" who brings it "from somewhere in Minnesota."[83] And Pfeilsticker's questions relating to cocaine use were in response to the volunteered statements Wolfe made after being asked where and who he was getting the coke from.[84] Wolfe's initial statements were not used as impeachment, to get

---

[79] 470 U.S. at 314.
[80] *Robinson*, 140 F.4th at 995; *Walker*, 518 F.3d at 985.
[81] Suppress. Hr'g Ex. A, at 06:16–09:02, 16:37–17:34; *Robinson*, 140 F.4th at 995; *Walker*, 518 F.3d at 985.
[82] *Id*. at 00:29–04:44; *United States v. Jones*, 70 F.4th 1109, 1114 (8th Cir.), *cert. denied*, 144 S. Ct. 366 (2023); *United States v. Terry*, 400 F.3d 575, 582 (8th Cir. 2005); *Garreau*, 735 F. Supp. 2d at 1170.
[83] *Id*. at 05:04–05:32.
[84] *Id*. at 00:29–01:03, 03:40–04:00.

12

him to repeat the prior unwarned admissions, and his post-*Miranda* statements varied from those he earlier made.[85] Importantly, when he thought Wolfe wanted to discuss what happened that day, Pfeilsticker stated, "I have to read you something," and then administered *Miranda* warnings a minute later, after Wolfe started going on about how often he would use cocaine.[86] At the beginning of the interview, before *Miranda*, Pfeilsticker was focused on intelligence gathering, finding out who Wolfe's supplier was, and building a case against the supplier, not Wolfe.[87] Pfeilsticker knew that he could not use Wolfe's unwarned statements against him.[88] Crediting Pfeilsticker's testimony and motives for not *Mirandizing* Wolfe right away, the Court cannot find that Pfeilsticker employed a purposeful strategy of staged interrogations to get around *Miranda*.[89]

The "key" to a *Seibert* violation is whether the officer's questioning procedure was "'designed,' 'deliberate,' 'intentional,' or 'calculated' circumvention of *Miranda*."[90] Deputy Pfeilsticker did not engage in an orchestrated effort to skirt *Miranda* by delaying the issuance of warnings until Wolfe made incriminating statements.[91] The reasoning of

---

[85] *See id*. at 00:16–09:05, 16:37–17:49; *Torres-Lona*, 491 F.3d at 758; *Seibert*, 542 U.S. at 621 (Kennedy, J., concurring) (observing that the "postwarning interview resembled a cross-examination" and that the officer "confronted the defendant with her inadmissible prewarning statements and pushed her to acknowledge them").
[86] Id. at 02:44–04:33.
[87] Dkt. No. 39, at 28:10–13, 59:21–23, 62:19–22.
[88] *Id*. at 28:1–5, 53:17–20, 55:8–10, 59:13–20.
[89] *United States v. Black Bear*, 422 F.3d 658, 664 (8th Cir. 2005).
[90] *United States v. Elzahabi*, 557 F.3d 879, 884 (8th Cir. 2009); *Black Bear*, 422 F.3d at 664.
[91] *Robinson*, 140 F.4th at 995.

*Elstad*, therefore, applies and absent proof of coercion that would make Wolfe's warned statements involuntary—and there is none—the statements are fully admissible at trial.[92]

### C. Physical Evidence

#### 1. Safe Items

The rifle, THC, and cocaine are all admissible because they fall within the scope of the search warrant or under an exception to the exclusionary rule.

The Eighth Circuit has determined that a "search warrant authorizing the search of defined premises also authorizes the search of containers found on that premises which reasonably might conceal items listed in the warrant."[93] And officers do "not need a second warrant to complete the search of the safe" later on.[94]

Deputy Pfeilsticker and his fellow officers did not have to obtain a second warrant to force open the safes in Wolfe's residence. The original warrant was sufficient.

At any rate, the Supreme Court has held that a violation of *Miranda* does not justify the suppression of physical evidence that is the fruit of the suspect's unwarned, but voluntary statements.[95] Wolfe's statements in the patrol car were voluntary, as

---

[92] *Walker*, 518 F.3d at 985.
[93] *Johnson*, 709 F.2d at 516 (8th Cir. 1983) (citing *United States v. Ross,* 456 U.S. 798, 820, (1982) (dictum); *United States v. Wright*, 704 F.2d 420, 422–423 (8th Cir. 1983) (per curiam)).
[94] *Id*.
[95] *United States v. Patane*, 542 U.S. 630, 641–44, (2004) (plurality opinion); *id*. at 645 (Kennedy, J., concurring in judgment); *see also United States v. Morse*, 569 F.3d 882, 884 (8th Cir. 2009) (voluntary statements obtained

evidenced by his willingness to barter for a drag of his vape. Thus, even though his statements were obtained in violation of *Miranda*, the items found in the safe are admissible.

### 2. Urine Sample

Wolfe's urine sample and test results showing THC and cocaine in his system are likewise admissible, for at least two reasons.

First, Wolfe consented to providing such sample, and that consent was voluntary based on the totality of circumstances.[96] His custodial status did not vitiate his consent.[97]

Second, a bodily fluid sample would have inevitably been acquired and tested because Deputy Pfeilsticker had in mind an alternative plan he would have employed if consent was denied or invalid.[98] Pfeilsticker testified that whenever he finds drugs with a suspect, he asks the suspect for a urine sample.[99] If the suspect refuses to provide one, then Pfeilsticker requests a warrant for the suspect's blood.[100] Pfeilsticker affirmed that, to the best of his recollection, every time he has applied for a blood draw warrant, one

---

in violation of *Miranda* do not justify suppression of non-testimonial physical evidence that is the fruit of a custodial interrogation conducted without *Miranda* warnings).

[96] *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, (1973); *see also United States v. Mendenhall*, 446 U.S. 544, 557–58 (1980) (defendant's consent to search of her person was freely and voluntarily given).

[97] *See United States v. Watson*, 423 U.S. 411, 424–25 (1976).

[98] *See United States v. Baez*, 983 F.3d 1029, 1038–40 (8th Cir. 2020) (discussing the two stands of caselaw on the inevitable-discovery doctrine and concluding that application of the doctrine was proper and consistent with circuit precedent); *see also United States v. Thomas*, 524 F.3d 855, 860-62 (8th Cir. 2008) (Colloton, J., concurring) (pointing out the differences between these two stands).

[99] Dkt. No. 39, at 61:7–17.

[100] *Id*. at 61:5–7.

has been granted.[101] And when he finds drugs, a warrant for bodily fluids is issued 99% of the time.[102] Given Pfeilsticker's consistent history of requesting and getting warrants for such fluids, and his discovery of drugs in Wolfe's possession, Pfeilsticker would have sought, and likely received, a warrant to obtain a urine or blood sample from Wolfe.[103]

## CONCLUSION

Officers reasonably relied on a properly issued warrant when they entered and searched Wolfe's home and seized evidence from it. Wolfe's unwarned statements to Deputy Pfeilsticker in the patrol car and at the jail were acquired in violation of *Miranda* and are inadmissible in the government's case. But the statements may be used to impeach Wolfe's trial testimony. The warned jail statements were not the result of an impermissible two-step interrogation and are fully admissible under *Elstad*. The contraband from the safes was lawfully impounded based on the warrant or as the physical "fruit" of Wolfe's in-car voluntary statements. The urine sample taken from him is not suppressible either because he consented to providing one, and a urine or blood sample would have inevitably been procured via a warrant for his bodily fluids.

---

[101] *Id*. at 61:2–4.
[102] *Id*. at 61:5–7; 64:5–7.
[103] *See Baez*, 983 F.3d at 1040 (officer disposed to getting a warrant if consent refused); *United States v. Hammons*, 152 F.3d 1025, 1030 (8th Cir. 1998) (officer had in mind "an alternative plan" they would have pursued if the constitutional violation had not occurred).

## RECOMMENDATION

For all of these reasons, and based on the record now before the Court, it is

RECOMMENDED that Wolfe's motion to suppress[104] be granted in part and denied in part. The motion should be granted to the extent it seeks to exclude Wolfe's unwarned statements as substantive evidence, but it should otherwise be denied.

## NOTICE

The parties have 14 calendar days after service of this report and recommendation to object.[105] Unless an extension of time for cause is later obtained, failure to timely object will result in the waiver of the rights to appeal questions of fact.[106] Objections must "identify[ ] those issues on which further review is desired."[107]

DATED this 7th day of October, 2025.

BY THE COURT:

_____
**MARK A. MORENO**
**UNITED STATES MAGISTRATE JUDGE**

---

[104] Dkt. No. 24.
[105] 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(2).
[106] *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990) (per curiam); *Nash v. Black*, 781 F.2d 665, 667 & n.3 (8th Cir. 1986).
[107] *Nash*, 781 F.2d at 667 (quoting *Thomas v. Arn*, 474 U.S. 140, 155 (1985)).